UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DAVID McCARTY,

                Plaintiff,                        CASE NO. 04-72619

-vs-                                    PAUL D. BORMAN
                                         UNITED STATES DISTRICT JUDGE

ADRIAN STEEL COMPANY,

                Defendant.
_____/

**<u>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

        Presently before the Court is Defendant Adrian Steel Company's Motion for Summary

Judgment.

**<u>BACKGROUND:</u>**

        Plaintiff David McCarty ("Plaintiff") was an at-will employee with Defendant Adrian

Steel Company ("Defendant") from November 11, 1996 to March 20, 2003. (Def.'s Br. 5).

During his employment, Plaintiff had been disciplined on several occasions for excessive

absenteeism and once for poor quality of work. (*Id.*; Def.'s Br. Ex. A). The last reprimand for

absenteeism  prior to his eventual termination in March, 2003 occurred on February 20, 2002.

        On November 14, 2002, Plaintiff, who was then employed as a press operator, left his

shift early because his vision became impaired. (Def.'s Br. 5). Shortly thereafter, Plaintiff was

diagnosed with Type II mellitus diabetes by his treating physician, Dr. Trariq A. Siddiqi, M.D.

Plaintiff requested and received leave pursuant to the Family Medical Leave Act ("FMLA") for

his condition. (*Id.*).

On January 14, 2003, Plaintiff returned to work from leave.  (*See* Letter from Jefferson Pilot Financial Insurance Company, Pl.'s Resp. Ex. 11).  In February, 2003, Defendant sought employees to sign up for a voluntary layoff for the month of March due to a slowdown in its business.  Plaintiff and several other co-workers signed up for the layoff on the company's notice sheet.  Plaintiff was then granted a voluntary layoff for the month of March.  (*See* Voluntary Layoff Results for March '03, Pl.'s Resp. Ex. 16).

Plaintiff's Exhibit 16, a sheet produced by the company indicating those individuals who had accepted the sign-up, states that if Defendant's business was to pick up during the month of March, it would call those employees listed - including Plaintiff - to report for work, (*Id.*).  There is no indication that Plaintiff ever saw this Exhibit and Plaintiff denies ever seeing this paper. Plaintiff states that he was told that the layoff was scheduled to last for 30 days, and that he would be allowed to return to work at the end of March, 2003.  (Pl.'s Resp. 7).  Plaintiff denies that he was told by his supervisor, Randy Marks, that he might be called back to work early if business increased, *id.*, although Marks testified at his deposition that he believed he had informed Plaintiff. (Marks Dep. 71).  Plaintiff began his voluntary layoff on or about March 1, 2003.

On Friday, March 14, 2003, Defendant states that it telephoned all of its employees on voluntary layoff - including Plaintiff - to notify them that they were to begin work on Sunday evening, March 16, 2003.  (Def.'s Br. 6).

Plaintiff states that on March 14, 2003, he traveled to Northern Michigan to go fishing with a friend during the voluntary layoff period.  (Pl.'s Resp. 7).  He states that he did not have a cellular telephone and there was no way to reach him.  (Pl.'s 3/15/05 Dep. 246).  He further

states that his home received a recorded message from Sue Grof ("Grof"), Defendant's Human Resources Director, indicating that it was important that he call her by 4:30 p.m. that day. (Pl.'s Resp. 7). Nothing in the message indicated that Plaintiff was to return to work by a specific date and time. (*Id.*). Plaintiff states that his wife, Jolene McCarty, heard the message when she returned home from work at 11:30 p.m. on March 14, 2003. (Jolene McCarty Dep. 12-15). Plaintiff's wife states that she telephoned Grof on Saturday, March 15, 2003 between 8 a.m. and 10 a.m. to notify her that Plaintiff was in Northern Michigan and was unavailable, and that she left her work and home telephone numbers on the message. (*Id.* at 16).

On Monday, March 17, 2003, Randy Marks emailed Grof that Plaintiff was "the only employee that 3rd shift did not hear from. Could you call again." (Pl.'s Resp. Ex. 19). Grof responded that Plaintiff would be "charged for missed time" for Sunday night and that "[i]f that puts him in line for reprimand in regards to attendance, that's the way it is." (Pl.'s Resp. Ex. 19).

Plaintiff's wife stated that Grof called the residence on Monday March 17, 2003, and that she returned the call at approximately 10:15 a.m. to inform Grof that Plaintiff would be home very late Tuesday night and could not be reached by telephone. (Jolena McCarty Dep. 17-18). Plaintiff's wife states that Grof indicated that this was "unacceptable" and that it was further unacceptable for his wife to contact the Michigan State Police to locate him. (*Id.* at 18).

On Monday, March 17, 2003, Grof also sent a certified letter to Plaintiff stating that she had left multiple messages for him and that he must return to work immediately. (Pl.'s Resp. 8). The letter was mailed to the improper address, *see* Pl.'s Resp. Ex. 20, and was received by Plaintiff's son on Tuesday, March 18, 2003. (Jolena McCarty Dep. 22-23). Defendant extended Plaintiff's recall date to Tuesday, March 18, 2003 because Plaintiff and "several other

employees" did not receive the message to return. (Pl.'s Resp. Ex. 22). Despite this evidence, Defendant states that Plaintiff had two consecutive "no call no shows" as indicated in the notice of his termination, dated March 20, 2003, and that Plaintiff's recall date was only extended to March 17, 2003.

When Plaintiff returned to work on Wednesday night, March 19, 2003, he terminated, effective March 20, 2003, for excessive absenteeism, poor quality of work, and failing to report to work for two consecutive days after being called back from a voluntary layoff. (Def.'s Br. Ex. A).

Plaintiff filed his an Equal Employment Opportunity Commission ("EEOC") charge of discrimination on December 16, 2003. (Pl.'s Resp. 10). On April 29, 2004, the EEOC dismissed Plaintiff's claim because it could not conclude that Plaintiff had proven the violation of any statutes. (Pl.'s Resp. Ex. 25).

Plaintiff then filed his Complaint on July 15, 2004, alleging that Defendant terminated his employment in violation of the FMLA, 28 U.S.C. § 2601, et. seq., and the Americans with Disabilities Act, 42 U.S.C. § 12101, et. seq. ("ADA"). Defendant filed its Motion for Summary Judgment on September 21, 2005.

## ANALYSIS

### A.    Standard for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there

4

is no genuine issue of material fact as to the existence of an essential element of the nonmoving

party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause

of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.

1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted). A dispute over a

material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine

issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.

1993). In making this evaluation, the court must examine the evidence and draw all reasonable

inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-

11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a

showing that is "sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial" will mandate the entry of summary

judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere

5

allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in

Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e).  The rule requires that non-moving party to introduce "evidence of

evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd.

of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see also Anderson*, 477 U.S. at 252 (holding that the

non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.     Discussion**

    **1.     Violation of FMLA**

    Plaintiff relies upon the fact that he had taken FMLA leave several times in the past to

prove that Defendant terminated him because it believed he might take more FMLA leave in the

future.[1]  To establish a *prima facie* case of retaliation using indirect evidence, a plaintiff must

show that: (1) he availed himself of a protected right under the FMLA by notifying the employer

of his intent to take leave; (2) he was adversely affected by an employment decision when he

was discharged; and (3) the proximity in time between plaintiff's request for leave and his

discharge constitutes indirect evidence of a causal connection between the exercise of a

protected right and the adverse employment decision.  *Skrjanc v. Great Lakes Power Service

Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  A district court within the Sixth Circuit has found that a

proximity of two months between FMLA leave and discharge is sufficient for purposes of

establishing a *prima facie* case.  *See McConnell v. Swifty Transportation, Inc.*, Case No. 04-

0153, 2005 U.S. Dist. LEXIS 15565, at *27 (S.D. Ohio July 29, 2005) (unpublished).  If the

---

[1] Plaintiff stated in his deposition that he had no direct evidence that he was being
terminated for exercising his rights under the FMLA.  (Pl.'s 8/30/05 Dep. 24-25, 36).

6

plaintiff establishes a *prima facie* case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action. The burden then shifts back to the plaintiff to prove that the proffered reason was pretextual. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

In *Joostberns v. United Parcel Services* ("UPS"), No. 04-2370 (6th Cir. Jan. 9, 2006) (unpublished), the Sixth Circuit reviewed a district court's decision granting summary judgment to defendant on the plaintiff's FMLA, ADA, and Michigan's Persons with Disabilities Civil Rights Act claims. Concerning Plaintiff's FMLA claim, the court found that plaintiff had demonstrated a *prima facie* case of retaliation under the FMLA. *Joostberns*, slip op. at 17. The plaintiff was a UPS driver who had taken leave for his depression under the FMLA . *Id.* at 3. When the plaintiff returned from leave nearly two months later, UPS placed him at the UPS customer counter and did not reinstate him to his former position as a driver. *Id.* Shortly thereafter, UPS accused the plaintiff of shipping packages without paying for them. *Id.* UPS investigated the situation and eventually terminated the plaintiff. *Id.* at 4. The termination occurred three weeks after the plaintiff returned from his leave. The plaintiff testified during his deposition that his supervisor told him that he was taking too much time off work and that his absences would result in negative consequences. *Id.* at 14.

In finding that the plaintiff had demonstrated the existence of a *prima facie case* of retaliation under the FMLA, the circuit court found that the first two factors were met because plaintiff exercised his right to take leave for his depression under the FMLA and was terminated three weeks after he returned from leave. *Joostberns*, slip. op. at 17. The court found that the plaintiff also met the third factor of a causal connection because of two main reasons: temporal

proximity and the negative comments of Plaintiff's supervisor.  *Id.*  The court held that defendant's investigation of the plaintiff shortly after he returned to work and his supervisor's comments to the plaintiff indicating that his absences were a problem were sufficient to find that the plaintiff had met his burden of proving the required causal connection.  *Id.*; *see also Richardson v. Monitronics Int'l, Inc.*, Case No. 05-10346, 2005 WL 3485872 (5th Cir. Dec. 21, 2005) (unpublished) (finding that hostile remarks by her manager and the temporal proximity of the remakrs to plaintiff's termination taken as a whole raised an issue of fact as to whether retaliation was a motivating factor in plaintiff's termination).

> ### a.    *Prima facie* case of FMLA violation

Taking the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has established a *prima facie* case of an FMLA violation.  As in *Joostberns*, Plaintiff exercised his right to take leave for his diabetes under the FMLA and was terminated by Defendant nearly two months after he returned to work.  Thus, Plaintiff has satisfied the first two factors of the *prima facie* case.

Moreover, the Sixth Circuit's finding in *Joostberns* supports that Plaintiff has established a causal connection between his termination and the exercise of his rights under the FMLA.  The supporting evidence in this case includes the proximity in time of the termination to Plaintiff's taking FMLA leave, the remarks made by Defendant's president, and the inquiry into Plaintiff's medical condition by Defendant's Human Resources Director on the day he was terminated. Prior to the incident in dispute, Plaintiff testified that Defendant's president stated in a meeting that he would find ways to terminate those employees who cost the company more insurance money because of their high medical expenses and/or abuse of the insurance system. (*See* Pl.'s

3/15/05 Dep. 170).  In addition, Plaintiff was granted FMLA leave on November 26, 2002 until

January 14 2003[2] because of his Type II mellitus diabetes.  Nearly two months later, at

Defendant's request, Plaintiff was placed on a month-long temporary layoff as of March 3, 2003.

Defendant then called Plaintiff back from the layoff as of March 17, 2003.  Plaintiff states that he

was never informed that he might be called back in less than a month.  The form Plaintiff signed

to go on the voluntary lay off explicitly states, "Please sign below if you are interested in taking

a voluntary lay-off for the month of March."  (Pl.'s Resp. Ex. 14).   Even the supervisor who

stated he was in charge of notifying employees of the voluntary lay off policy testified that he

was not certain that he had informed Plaintiff that he might be recalled in less than thirty days:

> Q:      And you're positive that when you were at David McCarty's machine
>           you said to him, if business picks up within the 30 days you'll be called
>           back earlier?
>
> A:      I'm not positive, no.  I'm sure I did.

(Marks Dep. 72).  Plaintiff has testified that he was not informed that he had to be available at

any time to return to work during the month of March.  Of course, at this stage of the proceeding,

the Court must view the evidence in the light most favorable to Plaintiff, who is the non-moving

party.

Although Defendant contends that it notified Plaintiff that he was to return to work on

March 17, 2003, Plaintiff states that he was inaccessible at the time Defendant called his home

because he was on vacation, and therefore, he was not aware until March 19, 2003, that he had

been called back to work.  Plaintiff states that he notified Grof, Defendant's Human Resources

---

[2] Although the Complaint and briefs indicate various dates on which Plaintiff returned to work in January, 2003, the Court will utilize the date listed in the letter from Jefferson Pilot Financial Insurance Company.  *See* Pl.'s Resp. Ex. 11.

Director, on Wednesday morning and informed her that he would be returning to work that night for his shift.  When Plaintiff expressed concern during the phone call over whether he would face any disciplinary action for not being available to work after the layoff ended, Grof told him that "nothing was going to happen" and that the company was just concerned whether he was going to return. (Pl.'s 8/30/05 Dep. 24).  Plaintiff states that, thereafter, he and Grof discussed his medical condition, at which time Plaintiff informed her that he had an issue with his kidneys that would require more medical testing.  After making this statement, Grof indicated to him that she was not aware that he would need more testing. When Defendant showed up for his shift later that evening, he was terminated at that time.

Given these facts, the Court finds that Plaintiff has proven a *prima facie* case of an FMLA violation.  Plaintiff has shown that Defendant may have had a bias toward individuals with expensive medical conditions.  In addition, he was fired just two months after having taken FMLA leave and only after he discussed his further need for treatment related to his diabetic condition.  Defense testimony conceded that Plaintiff was an excellent worker during the two months after his return from FMLA leave in January and February.  Thus, the burden now shifts to Defendant to proffer a legitimate, non-discriminatory reason for Plaintiff's termination.

### b.  Defendant's proffered legitimate, nondiscriminatory reason for termination

The Court finds that Defendant has proffered a legitimate non-discriminatory reason for his termination.  Defendant avers that Plaintiff was terminated because his absences in late March constituted two consecutive "no call, no shows," and Plaintiff had a history of attendance problems.  This explanation is supported by the testimony of Grof and Randy Marks, Plaintiff's Production Supervisor.  (Grof Dep. 37-40; Marks Dep. 151).   Grof remarked that she had told

10

Plaintiff that the two days that he failed to return to work would be counted against him.  (Grof Dep. 31).  She further stated that she recommended that Plaintiff be terminated because of his failure to be readily available for work and his previous attendance record.  (*Id.* at 39).  Her testimony is supported by an e-mail Grof sent to Marks in which she states that Plaintiff would be charged for missed time and that "[i]f that puts him in line for reprimand in regards to attendance, that's the way it is."  (Grof E-mail to Marks, Pl's Resp. Ex. 19).  Thus, the Court finds that Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's discharge.  However, Plaintiff may counter this conclusion by demonstrating that Defendant's proffered reason constitutes pretext.

### c.      Pretext

Pretext can be shown by offering evidence that Defendant's proffered reason had no basis in fact, did not actually motivate its decision, or was never used in the past to discharge an employee.  *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996).  The Sixth Circuit has recently stated that a showing of pretext requires that a plaintiff "offer evidence indicating either that the proffered reason was false, that it was an insufficient reason for termination, or that it was not the actual reason for termination."  *Joostberns*, slip. op. at 19.

Plaintiff argues that Defendant's profferred reason for terminating him was pretextual because: (1) Grof never reviewed Plaintiff's disciplinary history to learn that his absenteeism had not been an issue for 11 months; (2) Defendant failed and/or refused to designate those absences he did take as FMLA or to specifically inform Plaintiff of his obligations under the FMLA; (3) both Grof and Marks knew of Plaintiff's inability to return from the voluntary layoff and Defendant had no policy requiring that Plaintiff stay close to home during the layoff; (4) Grof

11

assured Plaintiff that no adverse employment action would be taken, asked about his health, expressed surprise at learning that he needed more kidney testing, and only then acted to terminate him; and (5) Defendant did not terminate or reprimand Kenneth Palmer, another employee who failed to return to work by the demanded date and time. Plaintiff contends that Defendant perceived him to be a potential liability and wanted to restrict related medical costs to the company.

The Court finds that the above allegations are sufficient to raise a genuine issue of material fact as to whether Defendant's non-discriminatory reason for terminating Plaintiff was pretextual. Taking the facts in a light most favorable to the non-moving party, Plaintiff has at least raised an inference that he was terminated in violation of his FMLA rights. Following Plaintiff's conversation with Grof, he believed that he was scheduled to return to work without consequence. Yet when he showed up for his shift later that night, he was terminated. Plaintiff suggests that the only occurrence between Grof's assurance that he could return to work and his eventual termination was the conversation with Grof in which she asked him about his medical condition and expressed surprise that he would still be in need of kidney testing. This statement, taken with the previous statement by Defendant's president that it wanted to get rid of those employees who would incur excessive medical costs for the company, and the close proximity in time to his FMLA leave, raise an inference that Defendant's proffered reason for terminating Plaintiff was pretextual. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's FMLA claim is denied.

### 2.      Violation of ADA

"To establish a prima facie case [of discrimination] under the ADA, a plaintiff must

demonstrate that (1) [he] was disabled, (2) [he] was qualified to perform the essential functions of the job, and (3) [his] employer subjected [him] to discriminatory treatment solely because of [his] disability." *Collins v. Blue Cross Blue Shield of Michigan*, 228 Mich. App. 560, 568 (1998).

Defendant disputes that Plaintiff qualified as disabled because his diabetes did not significantly limit any major life activities. To qualify as disabled, a plaintiff must meet one of three definitions of a disability: (1) a physical or mental impairment that substantially limits one or more of the major life activities of each individual; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. §12102(2). Both parties concede that Plaintiff suffered from diabetes. Despite the unquestionable seriousness of diabetes, merely suffering from diabetes, when properly treated and controlled, does not qualify as a disability under the ADA. *Gilday v. Mecosta Cty.*, 124 F.3d 760, 762 (6th Cir. 1997).

The facts show that Plaintiff's diabetes was under control at all times subsequent to his return from FMLA leave in January, 2003. On January 13, 2003, Plaintiff's treating physician examined Plaintiff and found him to be healthy:

> Q:    Based on your experience and based on the documents in front of you would you classify in a medical sense David McCarty on January 13th, 2003 as being disabled?
>
> A:    No. According to the documentation he looks healthy though he has got a very bad disease, diabetes, and we all know it's not – it's not really a disease that causes a lot of morbidity and not a very easy disease to treat and not an easy disease for the patient to have. You have to understand that they have to change their lifestyle, their diet, and it's not easy. And my experience is – I mean, the patient as a human being has to deal with a lot. When my patients are diagnosed with diabetes, they have to deal with a lot. They have to leave so many foods. It's a tremendous stress and it's a very, very morbid and difficult disease to control in the long run.

13

Q:      But David McCarty as of 42-years-old on January 13th, 2003 was
        following as far as you could tell from the examination was following
        your plan of action, correct?

A:      Yeah.  According to this what I was telling he was getting there, he
        was slowly, and it takes a long time to educate a patient, to get them
        [to] change their lifestyle, to change their diet.  There are lapses and
        there are denial and there is so many psychological ramifications and
        it is a very bad disease.

Q:      But as of 1/13/2003 –

A:      He showed improvement, definite.

Q:      As of that point in time you believed in your medical opinion that he
        was able to go back to work, correct?

A:      Yep.  Yeah.

Q:      So at that point in time you saw him as able-bodied to do his job that he
        had at Adrian Steel?

A:      Yeah.  That's what it looks like, yes.

Dr. Siddiqi Dep. 14-15.  Plaintiff himself also indicated that he was not disabled:

Q:      Okay.  In March of 2003 when you returned to work on the 19th
        were you disabled?

A:      No.

Q:      Could you perform your job?

A:      Yes, I could.

Q:      In fact, hadn't you performed your job before then?

A:      Before I took the layoff, yes, I did.  I come back and I was feeling really
        good.

Pl.'s 8/30/05 Dep. 50.   Thus, his above testimony belies any finding that he had an ADA-

qualifying disability against which Defendant could have discriminated.

14

However, viewing the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has raised a genuine issue of material fact as to whether Defendant regarded him as disabled at the time he was terminated given the "kidney testing" discussion by Grof.[3]  Plaintiff had not had any disciplinary actions taken against him in the approximately nine months prior to taking FMLA leave for his diabetes in late November of 2002.  He then returned to work for Defendant in January of 2003 and worked effectively without incident until he took a voluntary layoff in March of 2003.  When he committed himself to the voluntary leave, the sign-up sheet explicitly stated that the leave would be for the month of March.  Plaintiff states that he went on vacation because he did not know that he was to be available at a moment's notice.  Nevertheless, he called Defendant as soon as he returned and realized that Defendant had called him back from the layoff.  Plaintiff is then told by Grof, Defendant's Human Resources Director, that he can return without incident, and then Grof questions him about his medical condition.  Only a few hours after Grof asks him about his medical condition, and Plaintiff responds that his

---

[3] As Plaintiff testified during his deposition:

A:      [Grof and I] got talking and that's when I said I was concerned.  I said you know if something was going to happen?

She told me no.  At that time nothing was going to happen.  We were just concerned that you are going to return to work.

I said yes.  I will be into work tonight.

We got talking about my medical condition at that time and that's when my conversation was brought up about my kidneys.  And we were talking.

And she goes, oh, I didn't realize you still had testing to do on your kidneys.  The next thing I know when I returned to work I was terminated.

(Pl.'s 8/30/05 Dep. 24).

diabetes has resulted in the need for more kidney testing, Plaintiff is terminated by Defendant. On these facts, Plaintiff has at least raised an inference that Defendant believed that his diabetes was going to cause him to miss work.  Accordingly, the Court denies Defendant's Motion for Summary Judgment on Plaintiff's ADA claim.

## CONCLUSION

Because Plaintiff has presented genuine issues of material fact as to whether he was terminated because Defendant believed he was disabled and might be in need of further FMLA leave, the Court DENIES Defendant's Motion for Summary Judgment on Plaintiff's FMLA and ADA claims.

**SO ORDERED.**


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  January 27, 2006

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 27, 2006.

s/Jonie Parker
Case Manager

16